[No. 30552-6-II. Division Two. August 31, 2004.]

SHURNA GRAY, ET AL., *Appellants*, v. PIERCE COUNTY HOUSING AUTHORITY, *Respondent.*

*Gregory D. Provenzano* (of *Columbia Legal Services*), for appellants.

*David Lieberworth* and *Ronald J. Knox* (of *Garvey Schubert Barer*), for respondent.

BRIDGEWATER, J. — The Pierce County Housing Authority (PCHA) and tenants participating in PCHA's Housing Opportunities and Personal Education Program (HOPE) both appeal a summary judgment order. Additionally, PCHA appeals an order of final judgment awarding the tenants attorney fees. We hold that the tenants have failed to demonstrate a property interest, either by writing or mutual understanding, in the rental units such that PCHA could not terminate a tenancy except for cause. We also hold that PCHA's HOPE program was not exempt from the Residential Landlord Tenant Act of 1973 as an "institution," and thus, PCHA was not permitted to use nonjudicial, self-help methods to evict HOPE tenants. We reverse the trial court's attorney fee award to Columbia Legal Services because the majority of the fees were for a preliminary injunction and for tenants who were not removed from their tenancy but remand for a determination of the portion of attorney fees related to a tenant who was removed from her tenancy. Accordingly, we affirm the rulings on summary judgment but reverse and remand the attorney fee award.

PCHA is a municipal corporation created by Pierce County pursuant to chapter 35.82 RCW. PCHA was created to provide safe and affordable housing for low-income Pierce County residents, and it currently owns and operates apartment complexes located throughout Pierce County. Under RCW 35.82.080, PCHA must keep rents "at the lowest possible rates," and it receives state assistance in the form of federal government subsidies and reduced rents in order to do so.

In 1995 and 1996, PCHA became concerned that increasing numbers of low-income applicants for housing were rejected during the screening process based upon their income and credit, rental, and criminal histories. PCHA developed an advisory council and sought input from community agencies in order to deal with this issue. PCHA determined that many of these applicants lacked various life skills that caused them to fail as tenants.

In 1997, PCHA created the HOPE program. Under this program, PCHA offered housing to individuals and families who, because of low income, bad credit, past evictions, or criminal history, could not obtain rental housing in the private or public sectors. PCHA did not receive any federal or state funds for the program, and, unlike PCHA's regular tenants, HOPE participants did not receive federal or state subsidies for their housing.

The "H.O.P.E. PROGRAM POLICY" states that the program's purpose was to "develop and administer an education and/or re-education program that would enable certain individuals that cannot obtain housing due to their inability to pass industry-wide standard criteria set forth in a tenant screening with an opportunity to secure affordable housing." Clerk's Papers (CP) at 780. In her declaration, deputy executive director for PCHA, Starla Warren, stated that prospective HOPE candidates were screened and interviewed for the program. Those accepted were "instructed that the emphasis of the program is on education and life style change." CP at 731.

HOPE participants did not sign a standard PCHA month-to-month lease agreement; rather, they signed a one-year "STUDENT/OWNER" contract. CP at 323. Participants were permitted, but not required, to live in PCHA housing during the program. Under the contract, participants living in PCHA housing were required to pay a "[l]odging fee," and all participants were required to attend a weekly class for four months and comply with PCHA rules and regulations. CP at 323. The classes were taught by PCHA staff and were intended to educate HOPE participants in the "fundamentals of becoming an ideal tenant." CP at 753. In addition, the contract contained a seven-day lockout clause. Under that clause, participants who breached the contract or violated PCHA rules and regulations would receive a seven-day notice to vacate and then PCHA would change their unit locks. Students who successfully completed the one-year program received a certificate of completion and were invited to enter into a standard PCHA landlord/tenant rental agreement.

On February 2, 2001, a HOPE program family that had been locked out and other HOPE program families filed a complaint against PCHA. The plaintiffs sought certification as a class on behalf of all HOPE participants subject to the seven-day lockout clause and a permanent injunction enjoining PCHA from using nonjudicial lockouts. The plaintiffs alleged two actual lockouts, one involving Shurna Gray and her family and another involving Sandra Gibson. Additionally, the complaint sought damages for the Gray family and attorney fees under chapter 59.18 RCW.

On February 6, the trial court entered an agreed temporary restraining order enjoining all nonjudicial lockouts and conditionally certifying the plaintiff class. As required by the order, PCHA returned Gibson her key. On April 6, the court entered a preliminary injunction continuing the interim ban on nonjudicial lockouts in connection with the HOPE program.

On April 10, PCHA terminated the HOPE program and permitted HOPE participants currently residing in PCHA

housing to apply for standard month-to-month rental agreements. The face of PCHA's standard month-to-month rental/lease agreements contains the following language: "Either party may terminate this agreement with **TWENTY (20) DAYS** WRITTEN NOTICE PRIOR TO THE LAST DAY OF A MONTHLY TERM (end of a month), in accordance with Washington State Law (RCW 59.18)." CP at 396. In addition, the agreements contain a standard integration clause, which states, "This writing embodies the entire Agreement between the parties . . . . Tenant agrees that any purported oral terms additional or contrary to this writing are not binding on either party." CP at 397.

On May 25, PCHA filed a motion for partial summary judgment to dismiss the plaintiff's lockout-related claims for injunctive and declaratory relief because the termination of the HOPE program had rendered them moot. On June 11, the plaintiffs filed a motion for partial summary judgment on the legality of PCHA's lockout policy. On July 13, the court granted PCHA's motion for summary judgment, dismissing all of the plaintiff's nonjudicial lockout claims because those claims were now moot. But the court ruled that its order did not affect the Grays' claims for damages.

On September 6, the court granted the plaintiffs' motion for partial summary judgment, ruling that HOPE participants' tenancies were governed by the Washington Residential Landlord Tenant Act of 1973 (RLTA), chapter 59.18 RCW, and that PCHA's policy of locking out tenants without court process violated the RLTA. Because the court had previously dismissed the plaintiffs' lockout claims as moot, the court's ruling affected only the Grays' claims.

On June 20, the plaintiffs filed a second amended complaint, alleging that the terms of PCHA's standard month-to-month lease agreements providing for termination without cause by either party upon 20-days' notice violate article I, section 3 of the Washington State Constitution and the fourteenth amendment to the United States Constitution. On September 28, PCHA brought a motion for sum-

mary judgment, seeking dismissal of the plaintiffs' due process claims related to its standard month-to-month rental agreements. In November, the trial court granted PCHA's motion, ruling that the plaintiffs did not have a constitutionally protected property interest in their ongoing month-to-month tenancies.

In April 2002, PCHA and the Grays entered into a settlement agreement. In the agreement, the Grays released PCHA from all causes of action or suits relating to the plaintiffs' second amended complaint, including claims for expenses or attorney fees. On December 5, 2002, the court entered an order awarding the plaintiffs $38,340 in attorney fees, finding them to be the prevailing party on the lockout issue.

The plaintiffs appeal the court's determination that no genuine issue of material fact exists as to whether PCHA's lease agreements violate the due process clause. In turn, PCHA cross-appeals the trial court's grant of summary judgment on the legality of its lockout policy and its award of attorney fees to the plaintiffs.

I. Summary Judgment Motions

Both parties contend that the trial court erred in entering summary judgment against them. When reviewing an order of summary judgment, we engage in the same inquiry as the trial court. *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 595, 70 P.3d 954 (2003). Summary judgment is proper if the pleadings, affidavits, depositions, and admissions on file demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. *Wood v. Battle Ground Sch. Dist.*, 107 Wn. App. 550, 557, 27 P.3d 1208 (2001). The nonmoving party may not rely on speculation or argumentative assertions that unresolved factual issues remain. *Retired Pub. Employees Council of Wash. v. Charles*, 148

Wn.2d 602, 612, 62 P.3d 470 (2003). Summary judgment is not proper if reasonable minds could draw different conclusions from undisputed facts or if all of the facts necessary to determine the issues are not present. *Ward v. Coldwell Banker/San Juan Props., Inc.*, 74 Wn. App. 157, 161, 872 P.2d 69, *review denied*, 125 Wn.2d 1006 (1994).

A. *Procedural Due Process*

The tenants contend that the trial court erred in determining that terms in PCHA's rental agreements providing for termination without cause by either party upon 20-days' notice do not violate article I, section 3 of the Washington Constitution and the fourteenth amendment to the United States Constitution. Specifically, the tenants argue that they have a constitutionally protected property interest in their month-to-month tenancies based upon a "mutually explicit understanding" with PCHA that it would evict them only for cause. Br. of Appellant at 31. PCHA responds that the terms of its month-to-month lease agreements are clear—either party may terminate the lease after 20-days' notice, and it shared no "mutually explicit understanding" with its tenants that they would be evicted only for cause. Br. of Cross Appellant at 29. PCHA is correct.

■■ The fourteenth amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. Under Washington Constitution article I, section 3, "[n]o person shall be deprived of life, liberty, or property, without due process of law." At minimum, procedural due process requires notice and an opportunity to be heard. *Silver Firs Town Homes, Inc. v. Silver Lake Water Dist.*, 103 Wn. App. 411, 425, 12 P.3d 1022 (2000), *review denied*, 143 Wn.2d 1013 (2001). For due process protections to be implicated, a plaintiff must assert an individual interest that is encompassed within the protection of life, liberty, or property. *Silver Firs*, 103 Wn. App. at 425-26. A property interest may be created by the

terms of a contract or by a "mutually explicit understanding" between parties that support a claim of entitlement to a benefit. *Conard v. Univ. of Wash.*, 119 Wn.2d 519, 530, 834 P.2d 17 (1992), *cert. denied,* 510 U.S. 827 (1993); *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972). A claim of entitlement must be more than an abstract need or desire for, or a unilateral expectation of, a state benefit. *Conard,* 119 Wn.2d at 529.

In *Perry v. Sindermann,* the U.S. Supreme Court found that a genuine issue of material fact existed as to whether the claimant, a teacher in the Texas college system, and the college administration had a mutually explicit understanding that he was entitled to job tenure. *Perry,* 408 U.S. at 602-03. In making this determination, the Court noted that the college's written faculty guide stated that the administration "wishes [a] faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory." *Perry,* 408 U.S. at 600. Additionally, the Court considered Coordinating Board of the Texas College and University System written regulations stating, "Tenure means assurance to an experienced faculty member that he may expect to continue in his academic position unless adequate cause for dismissal is demonstrated." *Perry,* 408 U.S. at 601 n.6.

In *Conard,* our Supreme Court held that University of Washington (UW) football players did not have an entitlement to renewal of their athletic scholarships. *Conard,* 119 Wn.2d at 533-34. The plaintiffs asserted that there was a "common understanding" that the scholarships would be renewed for at least four years. *Conard,* 119 Wn.2d at 533. The court held that there was no such understanding—the students' offers of aid clearly stated that their scholarships were for "*three* consecutive quarters," no specific persons made any assurances to the plaintiffs regarding a right to renewal, and no written UW rules or policies supported the plaintiffs' claims. *Conard,* 119 Wn.2d at 530, 533. And while the court considered statements by the chairman of UW's Athletic Financial Aid Committee, Eric Godfrey, that the

university had a "commitment" to renew students' aid if they followed all NCAA (National Collegiate Athletic Association) regulations, *Conard*, 119 Wn.2d at 523, it found that Godfrey's statements did not create a mutual understanding of renewal because "nothing in the record indicates Godfrey *told this to the plaintiffs.*" *Conard*, 119 Wn.2d at 533 (emphasis added). In addition, the court held that the plaintiffs' assertion that all of their teammates had their scholarships renewed was insufficient to establish a mutually explicit understanding of renewal. *Conard*, 119 Wn.2d at 534.

■■ Here, as the tenants concede, the terms of PCHA's standard month-to-month leases are clear and unambiguous—either party may terminate the lease without cause upon 20-days' notice . Thus, the contract terms do not create a legitimate claim of entitlement to termination only by cause, and the only question before this court is whether an entitlement was created by mutually explicit understandings between PCHA and its tenants.[1]

Here, the tenants attempt to demonstrate a mutual understanding by referring to the depositions of two high-level PCHA employees. They argue that this testimony evinces PCHA's "policy, custom, and practice" of terminating month-to-month tenancies only for cause. Br. of Appellant at 22. Bobbie Jones, a housing supervisor for PCHA, testified that when tenants move into PCHA housing, she explains the notice provisions in their lease to them. When asked whether tenants had an understanding that if they paid their rent and followed all lease regulations, they would be safe from eviction, Jones stated, "I would hope so." CP at 473. Additionally, she testified that PCHA generally did not evict tenants "without a reason," CP at 473, and

---

[1] PCHA argues that, because its standard month-to-month leases contain an integration clause, this court should invoke the parol evidence rule and refrain from considering any other extrinsic evidence of understandings between PCHA and its tenants. PCHA is in error. The plaintiffs are not bringing an action in contract; they are bringing a constitutional due process claim. In assessing procedural due process claims, courts consider both contracts between the parties and their mutual understandings. *See Conard*, 119 Wn.2d at 530-31. Therefore, we may consider extrinsic evidence on the record that demonstrates the parties' understandings.

that PCHA "normally [didn't] give 20-day notices." CP at 477.

Similarly, Starla Warren testified that PCHA has a general policy not to evict tenants without reason and that, "generally speaking," it advises tenants of the reason(s) for an eviction. CP at 505-06. She also explained that PCHA provides tenants with an opportunity to appeal "up the chain of command" and that in some cases, the process results in a change of decision. CP at 506. Additionally, Warren testified, "It was the Housing Authority's policy and widely discussed that we do not do a 20-day no cause even though you're allowed to do it in Pierce County . . . we generally required cause." CP at 510. However, in extreme situations, PCHA may issue a 20-day notice without cause. When questioned as to whether PCHA represented to new tenants that they would be evicted only for cause during their orientation, she stated, *"they wouldn't get into that."* CP at 516 (emphasis added).

In addition, the tenants refer to the declaration of PCHA tenant Lisa Burke. Burke stated that she believed that PCHA would not evict her unless she was "causing problems, breaking the rules, or not paying [her] rent." CP at 541. She further stated that she held that belief because, when she signed her lease, the manager "read through the lease and the housing authority rules with me, and told me that I could continue to live here as long as I follow the rules and pay my rent." CP at 541.

■ ■ Although the tenants have amply demonstrated that PCHA has a general policy against evicting month-to-month tenants without cause, they have failed to point to any explicit, written rules or regulations establishing this policy, and thus, their claim must fail. In *Perry*, the Court found a mutual understanding of de facto tenure in the college's written official faculty guide and written guidelines promulgated by the Board of the Texas College and University System. *Perry*, 408 U.S. at 600-01. In contrast, the *Conard* court found that the students and UW athletic administration lacked a mutual understanding that stu-

dents' scholarships would be renewed for four years because the students could not point to any "written UW rule or policy" establishing a right to renewal. *Conard*, 119 Wn.2d at 533. Thus, courts have approached claims of entitlement to a government benefit with care and have generally required claimants to show explicit, written statements establishing such an entitlement. Here, the only explicit, written understanding between PCHA and its tenants is the understanding contained in their month-to-month leases.

Moreover, where courts have considered oral statements of policy in assessing whether parties have a mutually explicit understanding, they have required claimants to show that these statements were specifically communicated to them and that they relied upon them. *See Conard*, 119 Wn.2d at 533-34. Here, although high-level PCHA employees testified that the institution has a general policy against evicting tenants without cause, they also stated that this policy is not communicated to their tenants. At best what they expressed was aspirational, but PCHA allowed for use of the 20-day notice provision in extreme situations or in cases of apartment renewal or refurbishment.

The only information communicated to tenants during their orientation is the terms of their lease. Thus, PCHA and its tenants did not share a "mutual explicit understanding" that 20-day notices would be issued only for cause. Moreover, statements by current PCHA tenants of a general belief that their tenancies will not be terminated as long as they follow their lease and pay their rent have no bearing on whether they believed that the explicit 20-day-notice-without-cause provision in their lease actually would be invoked only for cause. Probably all tenants have a general belief that they will not be evicted if they follow their lease and pay their rent. However, most tenants also believe that specific provisions in their lease apply to their tenancy—including 20-day notice provisions permitting either party to terminate a month-to-month tenancy without cause.

In sum, the tenants have failed to demonstrate any mutually explicit understandings with PCHA that they would be evicted only for cause. PCHA's standard month-to-month leases clearly state that either party may terminate the tenancy without cause upon issuing a 20-day notice. In addition, PCHA's general policy against evicting tenants for cause is not codified in any policy manual or regulation and was never communicated to PCHA tenants. Thus, the tenants have not shown a property interest in their continued tenancies and the trial court did not err in granting summary judgment for PCHA.

## B. *Seven-Day Lockout Policy*

PCHA contends that the trial court erred in determining that the seven-day lockout provisions in its HOPE contracts violated the RLTA. Br. of Cross Appellant at 30. Specifically, PCHA argues that the HOPE program was an "[e]ducational [[p]rogram]" and, consequently, was exempt from the RLTA's judicial eviction procedures under RCW 59-.18.040(1). Br. of Cross Appellant at 30. This argument is without merit.

■ First, as the tenants aptly point out, no landlord, including one not governed by the RLTA, may ever use nonjudicial, self-help methods to remove a tenant.[2] *See Olin v. Goehler*, 39 Wn. App. 688, 692, 694 P.2d 1129 (holding that a "lessor's unlawful lockout of one with a right to possession is a breach of the implied covenant of quiet enjoyment"), *review denied*, 103 Wn.2d 1036 (1985); *Aldrich v. Olson*, 12 Wn. App. 665, 672, 531 P.2d 825 (1975) (holding that where the landlord/lessor changed the locks on the home she was renting to the lessee, the lockout constituted an unlawful eviction and the lessee was entitled to sue for damages and breach of the covenant of quiet enjoyment). But PCHA contends that these were special tenants, i.e., those of an institution.

---

[2] PCHA does not argue that HOPE participants were not "tenants." Reply Br. of Cross Appellant at 2.

▮▮▮ PCHA's argument that it falls within the ambit of RCW 59.18.040(1) is not persuasive. RCW 59.18.040 provides in relevant part:

The following living arrangements are not intended to be governed by the provisions of this chapter . . . :

(1) Residence at an *institution*, whether public or private, where residence is merely incidental to detention or the provision of medical, religious, educational, recreational, or similar services, *including but not limited to correctional facilities, licensed nursing homes, monasteries and convents, and hospitals*.

(Emphasis added.)

PCHA first contends that the trial court erred in construing this statutory provision to be limited to "institution[s]" whose primary business is to provide the "services" enumerated in the statute and in determining that the statute does not apply because PCHA is not an "educational institution." Br. of Cross Appellant at 3, 30. PCHA argues that the focus of the statute is not upon institutions in a particular line of business, but upon the nature of the services provided—regardless of any other activities in which the subject institution may be engaged. In essence, PCHA asks this court to construe this provision as applying to any "institution" offering residence incidental to providing one or more of the enumerated services. Reply Br. of Cross Appellant at 4. It then provides this court with numerous reasons why the housing offered by HOPE was merely incidental to the educational nature of the program.[3]

However, we cannot simply ignore the second half of the provision. The provision, by its plain terms, applies only to institutions similar in kind to those specifically enumerated. Here, PCHA is not an "institution" as the term is used

---

[3] PCHA refers to the HOPE program policy manual stating that the program's purpose was to "**develop and administer an education and/or re-education program**." Br. of Cross Appellant at 6. It also highlights that HOPE participants were required to attend classes and that actual residence in PCHA housing was not a condition of participation in the HOPE program.

in the statute; its institutional purpose is not to provide educational services. Rather, PCHA is a municipal corporation that provides housing for low-income tenants. Thus, the fact that PCHA offered a program where housing may have been incidental to educational services is immaterial. PCHA clearly does not fall within the ambit of RCW 59.18.040(1). HOPE tenants did not live in a single complex but, rather, were housed in 18 separate buildings and were in the same kind of units as PCHA's regular tenants. Moreover, were we to hold that the statute did apply to PCHA, any future landlord could simply create a program offering one or more of the services enumerated in the statute and become exempt from all of the RLTA's provisions providing protection for tenants.

PCHA also contends that the trial court erred in granting summary judgment despite finding that a genuine issue of material fact existed as to whether HOPE program housing was incidental to the program's educational purpose. PCHA cites to *Sunrise Group Homes, Inc. v. Ferguson*, 55 Wn. App. 285, 288-89, 777 P.2d 553 (1989) (discussing what the term "incidental" means as used in RCW 59.18.040(1)), and both parties discuss at length the application of *Sunrise* to this case. However, any dispute about the educational nature of the HOPE program is irrelevant, as RCW 59.18.040(1) does not apply to PCHA. Thus, the trial court did not err in granting summary judgment for the plaintiffs.

## II. Attorney Fees

Lastly, PCHA contends that the trial court misconstrued RCW 59.18.290(1) and erroneously granted the plaintiffs $38,340 in attorney fees under that statute. PCHA is correct.

■■ ■■ Washington follows the American rule that neither party can recover attorney fees unless authorized by statute, contract, or recognized ground of equity. *Soper v. Clibborn*, 31 Wn. App. 767, 768, 644 P.2d 738 (1982). RCW 59.18.290(1) provides:

It shall be unlawful for the landlord to remove or exclude from the premises the tenant thereof except under a court order so authorizing. Any tenant *so removed or excluded* in violation of this section may recover possession of the property or terminate the rental agreement and, in either case, *may recover the actual damages sustained. The prevailing party may recover the costs of suit or arbitration and reasonable attorney's fees.*

(Emphasis added.) We review de novo a trial court's determination as to whether a particular statutory or contractual provision authorizes an award of attorney fees. *Schlener v. Allstate Ins. Co.*, 121 Wn. App. 384, 388, 88 P.3d 993 (2004).

 PCHA argues that the trial court erred when it construed RCW 59.18.290(1) as applying to the entire plaintiff class. The statute, by its plain terms, limits awards of damages and attorney fees to those tenants who have been actually removed or excluded from their property. Here, the tenants' petition for an injunction alleged only two lockouts, one involving the Grays and the other involving Sandra Gibson. No other class members alleged that they were removed or excluded from their apartments. The Grays gave up all claims to attorney fees when they settled with PCHA, leaving Gibson as the only class member qualifying under the fee-shifting provisions of RCW 59.18.290(1). According to the tenants' counsel, Columbia Legal Services, Gibson's situation consumed approximately five hours of legal time. Thus, the trial court erred when it awarded the plaintiff class $38,340 in attorney fees, and PCHA is entitled to a reversal of this ruling. But we remand for a determination of and award for the portion of attorney fees related to Gibson's lockout claim.

Affirmed in part, reversed and remanded as to attorney fee award.

HOUGHTON and ARMSTRONG, JJ., concur.