[No. 25813-3-I. Division One. September 3, 1991.]

KEVIN CONARD, ET AL, *Appellants,* v. THE UNIVERSITY OF WASHINGTON, ET AL, *Respondents.*

*Larry J. Landry* and *Holland & Scales P.S., Inc.,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Lloyd W. Peterson, Senior Assistant,* for respondents.

BAKER, J. — Two University of Washington students appeal the summary judgment dismissing their complaint, brought against the University for breach of contract and against Don James for contractual interference after the nonrenewal of their athletic scholarships. We reverse in part and affirm in part.

Vincent Fudzie and Kevin Conard were recruited for the University of Washington (UW) football team and offered athletic financial assistance in 1983. The offer stated:

> If you enroll, you will receive assistance for *three* consecutive quarters[.]
>
> . . . .
>
> This assistance will be considered for renewal during subsequent periods of attendance as long as you are a student in good standing, maintain normal progress toward graduation and are in compliance with all eligibility requirements of this institution, the Pacific-10, and the NCAA.[1]

A sheet attached to the offer explained that

> 4. After completion of the above stated period of this award, upon the recommendation of the Head Coach, the Director of Athletics, and the Faculty Representative, the Committee on Financial Aid will consider granting renewal of the assistance, providing you (1) meet the academic requirements of the National Collegiate Athletic Association [NCAA], the Pacific-10/Nor Pac Conference and the Univer-

---

[1]Attached to the offer was a sheet which stated:

"2. Financial aid shall not be revoked or altered during any period for which it has been granted except that the University may revoke aid in whole or in part if the student:

"  . . . .

"c. engages in serious misconduct warranting substantial disciplinary penalty[.]"

This language parallels the language of the NCAA Constitution 3-4-(c)(2):

"Aid may be gradated or canceled if the recipient . . . (iii) engages in serious misconduct warranting substantial disciplinary penalty[.]"

sity, and (2) are a student in good standing in every respect as determined by the rules, regulations and administrative decisions of the University, the Pacific-10/Nor Pac Conference and the National Collegiate Athletic Association.

Affidavits filed by Conard and Fudzie reflect their belief that the scholarship aid offered was for at least 4 years. Conard and Fudzie stated:

That the relationship between a student/athlete and the university/football program is expected to last for at least four years is commonly understood throughout the intercollegiate athletic community. It is only common sense, considering that these institutions do not spend all the time and energy required in recruiting these student/athletes with the expectation that they will only remain in their program for one year.

After enrollment at UW, Fudzie and Conard were reportedly involved in several incidents. Police reports in the record reflect investigations into the following alleged incidents:

1983 Conard was arrested for use of stolen meal cards. Fudzie was with Conard on one of the occasions but was unaware the card did not belong to Conard.

1984 Conard and Fudzie were arrested for extortion and unlawful imprisonment in an incident involving a UW coed.

1984 Fudzie broke a $50 dormitory window in anger.

1984 Fudzie and Conard assaulted a man in the dormitory and took his watch. The watch was returned.

1984 Fudzie forced his way into a student's dormitory room and assaulted him.

None of the incidents resulted in a prosecution. Coach James related in his affidavit that he met with and counseled Fudzie and Conard on three occasions after these incidents and warned them that they could be removed from the team and their scholarships discontinued if such behavior continued. Fudzie and Conard's affidavits do not mention any counseling by James but state they were never sanctioned or disciplined for any reason or placed

on any suspension or probation. Both Fudzie's and Conard's scholarships were renewed for the 1984 through 1985 and 1985 through 1986 school years.

James also stated in his affidavit that he met twice with Conard in October 1985 due to his unacceptable behavior toward equipment personnel and his failure to report an injury properly. James stated he told Conard that because of all the problems, James would probably not recommend renewal of his financial aid.

Two months later the team traveled to California to compete in the Freedom Bowl. Fudzie and Conard were arrested after an altercation at a restaurant and did not appear at practice. James stated that he spoke with Conard, Fudzie, and the arresting officer, following which he told the students they could not play in the bowl game. He also told them they were off the team, and that although their scholarships would continue until the end of the school year, he would not recommend renewal of the scholarships. Conard and Fudzie stated in their affidavits that they were totally exonerated in this incident and all charges were dropped. Further, Conard and Fudzie, who are African-Americans, stated that the incident occurred because the restaurant had a policy of excluding minorities. James stated that he felt the students should have avoided a confrontation by walking away when asked to leave.

The UW Intercollegiate Athletics Policies and Procedures Manual identified by the Director of Financial Aid, Eric Godfrey, at his deposition, sets out the process for nonrenewal of financial aid:

> (b) If a coach wishes to withdraw a recommendation for financial aid at any time, justification within the rules of the Conference and the Associations (AIAW/NCAA) must be fully established. Each student-athlete is entitled to due process and if the student-athlete requests an appeal as well as a hearing, one will be provided.

Both students were sent notification July 1, 1986, that their scholarships would not be renewed. Fudzie

requested a hearing, which was held before the UW Athletic Financial Aid Committee in September 1986. Godfrey, who chaired the committee, stated in his deposition that the committee was unaware if there were findings of guilt or innocence as to the meal card, extortion, or California incidents. No documentation was provided to the committee.[2] Godfrey stated that the cumulative effect of the numerous instances of violation of standards set by James constituted serious misconduct. The committee upheld the nonrenewal and so notified Fudzie by letter dated October 16, 1986.

Fudzie received nonathletic financial aid the next school year, but either applied late or did not apply the following year and did not receive any aid that year. He graduated with a B.A. in accounting in 1988. Conard was dropped from the UW for inadequate academic performance in the spring of 1986 when his cumulative GPA was 1.99. He transferred to San Diego State University where he expected to graduate in 1990.

Fudzie and Conard brought this suit for damages in 1988, alleging breach of contract by UW and intentional interference with contractual relations by James and the UW. After summary judgment for the defendants, Fudzie and Conard filed this appeal. Because Conard was ineligible for renewal of his scholarship based on his academic performance and because he did not request a hearing after notification of his nonrenewal, we affirm the dismissal of his complaint. We also affirm dismissal of Fudzie's

---

[2]The deposition of Eric Godfrey, the committee chairman and Director of Financial Aid, reflects that the packet of information received from James *after* the hearing contained: a cover memorandum from James; a copy of the team rules; a summary of Fudzie's difficulties; and a sheet describing Fudzie's interactions with the University Book Store staff and supporting receipts.

The record on appeal notes prehearing affirmation and statement of proof at pages 1-138 of the University's clerk's papers. The hearing referred to is not the Athletic Financial Aid Committee hearing, but is an arbitration scheduled before the summary judgment motion was brought. This record is much more substantial than the information provided to the Athletic Financial Aid Committee.

complaint against defendant James, but reverse the dismissal of Fudzie's complaint against the University.

## I

Fudzie contends the trial court erred in finding no issue of material fact as to the duration of the contract. The University argues the contract is clear and unambiguous and evidence of player expectations does not affect the terms of the contract.

This court found in *Marquez v. UW*, 32 Wn. App. 302, 307, 648 P.2d 94, *review denied*, 97 Wn.2d 1037 (1982), *cert. denied*, 460 U.S. 1013 (1983) that an announcement in a law school handbook did not create a right in Marquez to obtain a law degree "absent his meeting and maintaining reasonable standards established by the Law School." Noting that a formal contract is rarely prepared in the student-university relationship, the court looked to a variety of university publications for contract terms. *Marquez v. UW*, 32 Wn. App. at 305. *See Maas v. Corporation of Gonzaga Univ.*, 27 Wn. App. 397, 618 P.2d 106 (1980), *review denied*, 95 Wn.2d 1002 (1981).

Unlike *Marquez*, here there is a formal contract offered by the University and signed by the player and his guardian. However, the written terms of the contract clearly spell out that the scholarship award is for three consecutive quarters, *i.e.*, one academic year, and that additional awards will be considered if the player is eligible and meets criteria established by the University, Pac-10, and the NCAA. We find no issue of material fact as to the duration of the contract.

## II

Since the renewal contract by its clear terms only lasted for three academic quarters, and the UW did not withdraw aid during that academic year, there was no breach of contract by the UW. Likewise, since there was no revocation of aid during the contract period, it is unnecessary to determine if Fudzie was guilty of serious

misconduct supporting such a revocation. However, our analysis does not end here.

■ ■ The University's practice is to renew athletic scholarships for at least 4 years. Further, it was the policy of the University to accord athletic scholarship students due process before nonrenewal. Even if it were not University policy, Fudzie's scholarship, issued under a representation that it would be renewed subject to certain conditions, provided him with a legitimate claim of entitlement that warrants the protection of due process before any deprivation of that claim of entitlement. *See Board of Regents v. Roth*, 408 U.S. 564, 577-78, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972).

If a person has a legitimate claim to entitlement, he or she is guaranteed the protections of due process. *See Goss v. Lopez*, 419 U.S. 565, 573, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975). In *Goss*, the United States Supreme Court found that, having extended the right to "education to people of appellees' class generally, Ohio may not withdraw that right on grounds of misconduct, absent fundamentally fair procedures to determine whether the misconduct has occurred." *Goss*, 419 U.S. at 574. Here, the University extended to a student athlete a contract for financial aid for 1 year and the promise to consider renewal given compliance with rules of the University, NCAA and Pac-10. The student thus had a legitimate claim in the nature of a property right worth thousands of dollars over the undergraduate period.

■ The next question is how much process is due. *Morrissey v. Brewer*, 408 U.S. 471, 483, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972). We must balance competing interests of an efficient and reasonable administrative process with the student athlete's right to a meaningful hearing. *See Goss*, 419 U.S. at 579. Clearly, at least notice and an opportunity to be heard are required. In addition, the student athlete who faces nonrenewal of his or her scholarship based on misconduct must be given a written copy of any information on which the nonrenewal recom-

mendation is based in time to prepare to address that information at the hearing. The student should be given the opportunity to present and rebut evidence, and the hearing must be conducted by an objective decision-maker.[3] The student has a right to be represented by counsel and to have a record made of the hearing for review purposes. Finally, the student has the right to a written decision from the hearing board setting forth its determination of contested facts and the basis for its decision. *See Morrissey v. Brewer*, 408 U.S. at 489.

We believe these requirements, while somewhat more stringent than those imposed in *Goss*, are in keeping with the reasoning of the Court in 419 U.S. 565. The additional safeguards are justified because the nature of the deprivation in this case exceeds the seriousness of the 10-day school suspension at issue in *Goss*, and because a hearing such as the one at issue here is relatively rare so no significant administrative difficulty should result. When the necessity for a hearing such as this does arise, the hearing must be conducted with the minimum due process safeguards outlined above. Otherwise, the opportunity for a hearing can be meaningless.

The procedure followed at the hearing requested by Fudzie falls far short of these minimum constitutional safeguards. The hearing here began with a brief statement by the director of athletics in support of the non-renewal recommendation. Coach James was not present, and the director disclaimed any desire to express James' rules without James being there. He stated he had information from James regarding Fudzie's involvement in the meal card incident and in an incident resulting in jail time (apparently the incident involving a coed). Regarding the latter incident, the director stated that he did not know if Fudzie had been vindicated or not.

---

[3] In this regard, inclusion on the hearing committee of a person who investigated the alleged misconduct in California at the request of Coach James was inappropriate.

Fudzie then addressed the committee. He denied any involvement in the meal card incident and told the committee he had been totally vindicated in the second incident mentioned by the director. Further, Fudzie informed the committee that the incident in California was racially motivated, that the club was known to have a racist policy, and that he had a civil suit pending. Fudzie acknowledged that prior to the California incident he had been warned by James to stay out of trouble or risk termination.

As Fudzie explained his version of the California incident, one unnamed committee member interrupted to dispute his statements. The committee member said he had the police report and he, at James' request, had talked to the California police the day after the incident to investigate the incident. Nothing in the transcript reveals whether other committee members or Fudzie reviewed the police report.

In discussing this hearing at a deposition, the committee chairman stated he was unaware if Fudzie had been found guilty in the meal card incident or in the extortion incident, and was unaware that Fudzie and Conard were exonerated in the California incident. He stated that the committee reviewed the numerous instances of Fudzie's violation of James' standards and decided that such behavior cumulatively constituted serious misconduct.

After the hearing, the committee asked for and received a packet of written materials from James, outlining team rules and Fudzie's difficulties. These materials were sent to Fudzie along with the letter communicating the decision of the committee to reject his appeal. This was too little, too late. Neither the committee nor Fudzie was informed of the critical facts regarding the alleged incidents of misconduct at the time of the hearing. No one knew whether or not Fudzie had been vindicated in the incidents, as he claimed. Apparently the California incident was the turning point for James, after which he told Fudzie his scholarship would not be renewed. Yet, at the

time of the hearing, the committee had no evidence regarding the outcome of the incident. Further, one committee member had investigated the incident for James and acted in a prosecutorial mode at the hearing, cross-examining Fudzie and leaving no question as to his or her lack of impartiality as a member of a supposedly independent appeals board.

Because the actions of the committee at the appeal hearing did not meet minimum due process requirements, we reverse and remand for entry of an order remanding Fudzie's case to the University for an adequate hearing. If the nonrenewal recommendation is retroactively affirmed after a proper hearing, Fudzie's action must fail. If the recommendation is rejected, then Fudzie will be entitled to the scholarship benefits he lost.[4]

## III

■ Fudzie contends James acted outside the scope of his authority in recommending nonrenewal and thus was personally liable for interfering with the contract between the player and the University.[5] The University and James contend that James was acting in good faith within the scope of his employment and that under *Houser v. Redmond*, 91 Wn.2d 36, 586 P.2d 482 (1978) he cannot be held liable for contractual interference. *Houser*, 91 Wn.2d at 39, held that: "Recovery for tortious interference with a contractual relation requires that the interferor be an intermeddling third party; a party to a contract cannot be held liable in tort for interference with that contract." (Citations omitted.) Instead, recovery for such interference would be through a breach of contract action. *Houser*, 91 Wn.2d at 39. Employees of a party are third parties

---

[4]Such an award may be subject to any applicable offsets and to potential defenses such as failure to mitigate damages for failing to timely apply for renewal of his nonathletic financial aid.

[5]Although the original complaint alleged interference by James and UW, the argument on appeal relates only to James.

only if they were acting outside the scope of their employment. *Houser*, 91 Wn.2d at 40. If an officer or employee of a corporation fails to act in good faith, then he is acting beyond his corporate authority, and good faith means "nothing more than an intent to benefit the corporation." *Olympic Fish Prods., Inc. v. Lloyd*, 93 Wn.2d 596, 599, 611 P.2d 737 (1980).

The record does not support the argument that James was acting without authority or outside the proper scope of his employment when he recommended nonrenewal of Fudzie's scholarship. Therefore, the trial court did not err in dismissing the claim of contractual interference against James.

## IV

We briefly comment on two additional issues. It is unnecessary to resolve the parties' argument concerning the applicable statute of limitations. Even assuming the shorter 3-year statute which the UW contends applies, the failure to provide the required due process to Fudzie occurred well within 3 years prior to this litigation.

Secondly, we reject the University's argument that under the State Higher Education Administrative Procedure Act (HEAPA)[6] Fudzie's claim is barred for failure to exhaust administrative remedies. Former RCW 28B.19-.110(2), relied upon by the University, provides:

> *Any person who is charged with an offense potentially punishable by suspension, or termination of his relationship with the institution* . . . (c) who deems himself aggrieved by the disposition of any contested case following an informal proceeding . . . may have charges against him adjudicated in a formal hearing pursuant to RCW 28B.19.120: *Provided,* That any request for a formal hearing is directed to the president of the institution or his designee . . . (iii) within ten days after conclusion of the informal proceeding and notice of the final decision to the party charged with an offense.

(Italics ours.)

---

[6]RCW 28B.19 (HEAPA) was in effect at the time of the actions at issue here. It was repealed by Laws of 1988, ch. 288, § 701, p. 1394, effective July 1, 1989. Laws of 1988, ch. 288, § 705, p. 1397.

676

However, Fudzie does not fit within the language emphasized above in former RCW 28B.19.110. He was not "charged with an offense potentially punishable by suspension, or termination of his relationship with the institution". Thus, the appeal procedure under that statute is inapplicable.

The decision of the Superior Court is reversed in part and affirmed in part in accordance with this opinion.

PEKELIS and AGID, JJ., concur.

Review granted at 118 Wn.2d 1014 (1992).