IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ZAIRE WEBB, an unmarried individual, | ) | No. 37051-8-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON STATE UNIVERSITY, | ) | OPINION PUBLISHED |
| MICHAEL C. LEACH, ANDREW LEHR, | ) | IN PART |
| KAREN FISCHER, and KELLY | ) | |
| MYOTT-BAKER, all in their individual | ) | |
| capacities only, | ) | |
| | ) | |
| Respondents. | ) | |

LAWRENCE-BERREY, J. — Washington State University (WSU) cancelled Zaire

Webb's four-year athletic scholarship after its football coach dismissed Webb from the

team for shoplifting. Webb appealed to WSU's Athletic Award Appeal Committee

(Appeal Committee/Committee). The Appeal Committee upheld WSU's decision to

cancel Webb's scholarship.

Webb brought suit and asserted several claims, including a 42 U.S.C. § 1983 claim

against the Appeal Committee, which he contends violated his right to procedural due

process. The trial court dismissed Webb's suit on summary judgment. With respect to

Webb's § 1983 claim, the court determined the Appeal Committee violated Webb's right

to procedural due process. It further determined the Committee was not entitled to

qualified immunity but was entitled to quasi-judicial immunity.

In the published portion of this case, we determine the Appeal Committee violated Webb's right to procedural due process and is not entitled to quasi-judicial immunity or qualified immunity. In the unpublished portion of this case, we determine Webb's remaining claims were properly dismissed. We, therefore, reverse the trial court's dismissal of Webb's 42 U.S.C. § 1983 claim, but otherwise affirm.

## FACTS

WSU's head football coach Michael Leach recruited Zaire Webb to play on the school's team. WSU offered Webb full financial aid for the spring 2017 semester and for the following four academic years. Webb accepted WSU's offer and enrolled.

The financial aid agreement provided:

This assistance may be reduced or cancelled . . . if the recipient:
. . . .
    (e)    Violates a nonathletically related condition outlined in the financial aid agreement or violates a documented institutional rule or policy (e.g., academics policies or standards, *athletics department or team rules or policies*)

Clerk's Papers (CP) at 321 (emphasis added).

The athletic department and team rules required all players to attend classes, attend weekly meetings with their academic advisors, and maintain open and honest lines of communication with their academic advisors, coaches, and professors. The team rules

2

also required all players to maintain high standards of integrity and behavior that reflected

well on coaches, teammates, the department of athletics and the university. Additionally,

Coach Leach had four core rules: (1) do not steal, (2) do not use drugs, (3) do not hit

women, and (4) do not do anything to hurt the team. He told his players if they violated

any of these rules, they would be dismissed from the team.

The WSU Student-Athlete Handbook (Handbook) imposed additional standards

and had a section on disciplinary process. That section read, in part:

> In the case of behavioral problems which involve formal criminal charges
> by a law enforcement agency, the involved student-athlete will be placed on
> suspension by the department of athletics until the facts of the incident are
> reviewed.

> **DISCIPLINARY PROCESS**

> . . . .

> - Absent extraordinary circumstances as determined by [the] director of
>   athletics and sport supervisor, <u>misdemeanor</u> charges and subsequent
>   discipline, therefore will be handled by the head coach, after review by the
>   director of athletics and sport supervisor. Further, these individuals will
>   consider the circumstances, as well as the past deportment of the involved
>   student-athlete in rendering a final decision.

CP at 359.

### Webb's Lack of Effort

As a football player on the WSU team, Webb was required to do strength and physical conditioning. Tyson Brown, the assistant strength and conditioning coach, frequently interacted with Webb. He believed Webb did not comply with training requirements, was dismissive toward the coaching staff, and consistently lacked effort. Brown shared these concerns with Coach Leach.

### Webb's Diluted Urine Sample

On October 3, 2017, Webb was told to come to the athletic trainer's office after he finished his 7:00 a.m. workout. He did not arrive until around 10:34 a.m. A trainer reminded Webb about WSU's drug testing policy, showed Webb an acknowledgement form he had earlier signed, and asked Webb to provide a urine sample. The test results, returned days later, were invalid because the sample was diluted. A person must drink an extraordinary amount of water to produce a diluted sample.

### The Shoplifting Incident

Late on October 4, 2017, Officer Aaron Breshears of the Pullman Police Department e-mailed Chief of Police Gary Jenkins that he had arrested two WSU football players—Zaire Webb and Anthony White. According to the e-mail, the two players had shoplifted several items from Walmart, including home drug testing kits. The next

morning, Chief Jenkins read the e-mail and reviewed Officer Breshears's initial arrest report. Chief Jenkins, in accordance with department policy, notified Antonio Huffman, Director of Football Operations, of the arrests. Chief Jenkins told Huffman one of his officers had arrested Webb and White the night before for shoplifting several items at Walmart, including drug testing kits.

Later that morning, Huffman saw Webb and asked what happened at Walmart the night before. Webb acted like he had no idea what Huffman was talking about. Huffman then told Coach Leach what he had heard from Chief Jenkins, including that some of the shoplifted items included drug testing kits. Coach Leach promptly dismissed Webb from the WSU football team.

### *Athletic Award Appeal Hearing*

On October 9, 2017, WSU's Student Financial Services (Financial Services) sent Webb notice that his athletic financial aid would be cancelled, effective January 1, 2018. The notice informed Webb he could request a written appeal or a formal appeal hearing. Webb requested a formal appeal hearing and used the form provided to him. On the form, Webb wrote he was wrongly arrested for theft, the charge was being dismissed, and he wanted a hearing to present new evidence.

The notice of cancelation briefly explained the appeal process:[1] The appeal form would be directed to the Chair of the Athletic Award Appeal Committee (Chair) and the coach or athletic representative would submit a written statement to the Committee with a copy to the appealing party. The Appeal Committee would then notify the parties of the time and place of the appeal hearing, where "[e]ach side w[ould] present their information to the appeals committee." CP at 495.[2] Also, the appealing party was required to notify Financial Services if they intended to appear with counsel. And after the hearing, the Chair would promptly issue a written decision.

In response to Webb's appeal, Coach Leach sent a letter to the Appeal Committee explaining why he dismissed Webb from the team. The pertinent part of the letter explained:

> Zaire Webb was dismissed from the Washington State University football team on October 5th for violation of team policy. His removal from the team was a culmination of events, which ended with his arrest on the suspicion of stealing from Walmart along with a teammate in early October.
>
> Our team rules are repeated regularly within the football program and there is no uncertainty where we stand in regard to upholding them. It is our consistent policy to dismiss any member of our football team that violates

---

[1] Webb never received an initial hearing where he could explain he did not shoplift. The appeal hearing actually was Webb's initial hearing.

[2] This phrase is ambiguous in that it may or may not allow witnesses to be called.

> any of the following: (1) do not do drugs, (2) do not steal, (3) do not hit a woman, and (4) do not do anything to hurt the team.
>
> In the months leading up to his dismissal, Zaire was involved in a series of events that called to question his commitment to the football program, as well as came into direct conflict with our team rules.

CP at 507. Webb received a copy of this letter.

The Appeal Committee was comprised of Kelly Myott-Baker, Assistant Director of Undergraduate Admissions; Andrew Lehr, Senior Financial Aid Advisor; and Karen Fischer, Associate Dean of Students. The Committee scheduled Webb's hearing for November 1, 2017.

The hearing was not recorded. Webb spoke to the Committee for about one-half hour. He explained the circumstances of his shoplifting arrest and maintained his innocence.[3] When questioned by the Committee, he denied he had any issues with academics, coaches, or trainers. He also told the Committee of instances where other players violated team rules but were not dismissed from the team. Once Webb finished speaking and answering the Committee's questions, the Committee directed him to leave.

---

[3] The hearing was not recorded, so we can only infer what Webb told the Appeal Committee. The record reflects that White passed the items near the scanning area while Webb watched, but most items were not detected by the scanner. We infer that Webb told the Committee he thought the items were properly scanned.

During the next one-half hour, the Appeal Committee heard from three athletic

department representatives, including Antonio Huffman, Director of Football Operations.

Huffman confirmed that Coach Leach had a team rule that a player who steals will be

dismissed from the team. He explained that Pullman police told him that Webb was

arrested for stealing merchandise from Walmart, which resulted in his dismissal from the

team. Once the athletic department representatives finished speaking and answering

questions, the Appeal Committee directed them to leave.

The Appeal Committee conferred and unanimously concluded that Coach Leach

was justified in dismissing Webb from the football team and that cancelation of Webb's

scholarship also was justified. The Committee did not believe Webb's claim that he was

innocent.

The same day of the hearing, Financial Services informed Webb of the Appeal

Committee's decision:

> This letter is to inform you that the Athletic Award Appeals Committee has
> reviewed your appeal request for nonrenewal of your athletic scholarship.
> After careful thought and deliberation, the committee has denied your
> appeal and finds that the athletic department acted within the rules and
> regulations of canceling your student aid.[4]

---

[4] More correctly, the athletic department dismissed Webb from the team. This
resulted in WSU canceling Webb's athletic scholarship.

8

CP at 517. The Chair never provided Webb with a written decision.

*Procedural History*

Webb brought suit against WSU, Coach Leach, and the three Appeal Committee members. He alleged four causes of action. As argued, these causes of action were: (1) a 42 U.S.C. § 1983 claim against the Appeal Committee members[5] for violating Webb's right to procedural due process, (2) a breach of contract claim against WSU, premised on statements contained in the Handbook, (3) a tortious interference with contract claim against Coach Leach, and (4) a negligence claim against all of the respondents, based on the process used that led to the denial of Webb's appeal.

After discovery, the respondents filed a summary judgment motion.[6] Webb produced evidence that four football players under Coach Leach, on separate occasions, had been arrested and charged with crimes that violated the core rules, yet none were dismissed from the team.[7]

---

[5] Even though the members were sued individually, we have and will continue to refer to them collectively as "the Appeals Committee," or "the Committee."

[6] Respondents submitted greater detail about Webb's arrest and other team rule violations to the trial court. We omit these details because there is no evidence they were brought to the attention of the Appeal Committee.

[7] Webb submitted a November 22, 2017 letter from WSU's Office of School Conduct and a December 22, 2017 WSU news clipping. We similarly omit these details because they were not brought to the attention of the Appeal Committee.

The trial court granted the respondents' summary judgment motion. With respect to Webb's § 1983 claim, the court determined the Appeal Committee had violated Webb's right to procedural due process, was not entitled to qualified immunity, but was entitled to quasi-judicial immunity.

Webb appealed. The Appeal Committee cross appealed the trial court's determination that it violated Webb's right to procedural due process and was not entitled to qualified immunity.

ANALYSIS

The standards for reviewing summary judgment orders are well established. We review a summary judgment order de novo, engaging in the same inquiry as the trial court. *SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 140, 331 P.3d 40 (2014). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "A material fact is one upon which the outcome of the litigation depends in whole or in part." *Atherton Condo. Apt.-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). We view all facts and reasonable inferences in the light most favorable to the nonmoving party. *SentinelC3*, 181 Wn.2d at

10

140.  Summary judgment is appropriate only if reasonable persons could reach but one conclusion from all the evidence.  *Id.*

42 U.S.C. § 1983

Webb contends the trial court erred by dismissing his 42 U.S.C. § 1983 claim on the basis that the Appeal Committee was entitled to quasi-judicial immunity.  The Appeal Committee contends the trial court erred by determining it violated Webb's right to procedural due process, a component of Webb's § 1983 claim, and erred again by determining it was not entitled to qualified immunity.

42 U.S.C. § 1983, otherwise known as the Civil Rights Act, "provides a federal cause of action for the deprivation of constitutional rights."  *Durland v. San Juan County*, 182 Wn.2d 55, 70, 340 P.3d 191 (2014).  It has long been settled that government actors cannot deprive citizens of property interests without procedural due process.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).  "To prevail in a § 1983 action alleging deprivation of procedural due process, a plaintiff must prove that the conduct complained of deprived the plaintiff of a cognizable property interest without due process."  *Durland*, 182 Wn.2d at 70.

*Procedural Due Process*

"'A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections.'" *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017) (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998)). Property interests are not created by the Constitution, instead "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). A property interest arises only where there is a legitimate claim of entitlement, not merely an abstract need or desire for the particular benefit. *Id.*

Webb had a legitimate claim of entitlement to his multi-year athletic scholarship. The scholarship was not subject to discretionary renewal, but instead provided, "If you enroll *you will receive this assistance for four academic years* . . . [but it] may be reduced or cancelled . . . if [you] . . . [v]iolate[ ] a . . . documented institutional rule or policy." CP at 321 (emphasis added). The Appeal Committee properly concedes that Webb had a protected property interest in his scholarship. *See* Resp'ts' Br. at 37.

12

"[O]nce a court determines that a protected interest has been taken, 'the question remains what process is due.'" *Brewster*, 149 F.3d at 983 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)).

Webb suggests the process due is defined by the Administrative Procedure Act (APA), chapter 34.05 RCW. In *Arishi v. Washington State University*, 196 Wn. App. 878, 385 P.3d 251 (2016), we held that WSU must comply with the full adjudicative process described in the APA before expelling a student for serious criminal misconduct. Webb may well be correct that WSU was required to comply with the APA before canceling his scholarship. But we need not answer this question of state law. This is because the question of whether the Appeal Committee violated federal due process is a question of federal law. *Loudermill*, 470 U.S. at 541. Federal due process does not necessarily entitle a plaintiff to the same procedures provided by state law. *Roybal*, 871 F.3d at 933.

"The core of due process is the right to notice and a meaningful opportunity to be heard." *LaChance v. Erickson*, 522 U.S. 262, 266, 118 S. Ct. 753, 139 L. Ed. 2d 695 (1998). Some sort of hearing is required. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 557-58, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). Other than notice and a meaningful opportunity to be

13

heard, "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews*, 424 U.S. at 334 (internal quotation marks omitted) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961)); *see also Wilkinson v. Austin*, 545 U.S. 209, 224, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005). "'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Mathews*, 424 U.S. at 334 (quoting *Morrissey*, 408 U.S. at 481).

In *Mathews*, the United States Supreme Court established a framework for evaluating the constitutional sufficiency of procedures. The Court created three factors to consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

The first *Mathews* factor directs us to consider the private interest affected by the governmental action. Here, Webb lost three and one-half years of his athletic scholarship

14

because he was dismissed from the football team.[8]  The financial loss to Webb was substantial.  For many people, the cancelation of a scholarship results in their inability to obtain a college education.  There is no evidence Webb qualified for other forms of financial aid.

The second *Mathews* factor directs us to consider the risk of an erroneous decision with the current procedures and the probative value of Webb's proposed additional procedures.  The Appeal Committee's procedures were lacking in several ways.  Most notably, Webb was not permitted to hear or respond to adverse witnesses and perhaps was not even entitled to call his own witnesses.  Also, the hearing was not recorded, and the Committee was comprised of three WSU officers who were asked to review the decision of an influential WSU coach.  Further, the Appeal Committee did not render a written decision, and Financial Services informed Webb the decision was not appealable. The process afforded Webb had many flaws that posed a substantial risk of an erroneous decision.  Webb's proposed procedures would require the Committee to allow Webb to hear and respond to adverse witnesses, issue a written decision with basic findings and

---

[8] The financial aid agreement explains that a full athletic scholarship covers "course related textbooks, tuition, mandatory fees, room & board, transportation, and miscellaneous living expenses."  CP at 321.

15

conclusions, record the hearing, and allow an appeal. These procedures are probative of truth finding and promote consistent, well-reasoned decisions.

The third *Mathews* factor requires us to consider the fiscal and administrative burdens the additional or substitute procedures would entail. There is little burden involved in permitting a party to hear and respond to adverse witnesses and issuing a written decision with basic findings of fact and conclusions of how those facts warrant or do not warrant relief. There is some fiscal or administrative burden for recording a hearing and providing an appeal.

When weighing the three *Mathews* factors, we conclude the process used by the Appeal Committee violated Webb's constitutional right to procedural due process. Our conclusion should surprise no one.

In *Conard v. University of Washington*, 62 Wn. App. 664, 814 P.2d 1242 (1991), *rev'd on other grounds*, 119 Wn.2d 519, 834 P.2d 17 (1992), we performed a truncated due process analysis of what procedures were required before a public school could cancel a student's scholarship for misconduct. We concluded that a student has a right to (1) receive a written copy of any information on which the nonrenewal recommendation is based, (2) present and rebut evidence, (3) have the hearing conducted by an objective decision maker, (4) be represented by counsel, (5) have a record made of the hearing for

review purposes, and (6) receive a written decision from the hearing board setting forth its determination of contested facts and the basis for its decision. *Conard*, 62 Wn. App. at 671-72.

On review, the Supreme Court reversed on the ground that the students did not have a legitimate claim of entitlement to the renewal of their scholarships. *Conard*, 119 Wn.2d at 530-31. There, the scholarships were renewable at the discretion of the financial aid committee. *Id.* at 530. Although the Supreme Court reversed our determination that the students had a protected property interest in the renewal of their scholarships, it expressly agreed with the remainder of our opinion when it concluded, "The Court of Appeals' decision is affirmed in all other respects." *Id.* at 538.

We agree with the trial court that the Appeal Committee violated Webb's constitutional right to procedural due process. We now turn to whether the Committee is entitled to either quasi-judicial immunity or qualified immunity.

a.      *Quasi-Judicial Immunity*

Webb argues the trial court erred when it determined that quasi-judicial immunity insulated the Appeal Committee from liability for violating his right to procedural due process. We agree.

17

Both parties discuss two cases, *Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 99, 829 P.2d 746 (1992) and *Taggart v. State*, 118 Wn.2d 195, 822 P.2d 243 (1992). Those cases are helpful, but do not set forth the applicable standards. Both cases involve the application of quasi-judicial immunity to *state* law causes of action. Webb's § 1983 claim is a *federal* cause of action. A state law defense cannot defeat a federal cause of action. *Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 375, 110 S. Ct. 2430, 110 L. Ed. 2d 332 (1990). We, therefore, must determine the contours of quasi-judicial immunity under federal law.

Defendants acting in a quasi-judicial capacity have absolute immunity from lawsuits, including § 1983 claims. *Burkes v. Callion*, 433 F.2d 318, 319 (9th Cir. 1970). For this reason, federal authorities often refer to the defense as *absolute* quasi-judicial immunity.

Several characteristics of the judicial process are helpful in determining whether absolute quasi-judicial immunity applies, including:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger v. Saxner*, 474 U.S. 193, 202, 106 S. Ct. 496, 88 L. Ed. 2d 507 (1985) (citing

*Butz v. Economou*, 438 U.S. 478, 512, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978)). The list

is nonexhaustive, and "an official need not satisfy every factor to be entitled to absolute

quasi-judicial immunity." *Miller v. Davis*, 521 F.3d 1142, 1145 (9th Cir. 2008). Instead,

we consider whether an official's role is "'functionally comparable'" to that of a judge.

*Id.* (quoting *Butz*, 438 U.S. at 513).

Cleavinger v. Saxner

In *Cleavinger*, the United States Supreme Court declined to extend absolute quasi-

judicial immunity to members of a prison disciplinary committee. 474 U.S. at 206. After

evaluating the *Butz* factors, the Court concluded the committee members did not perform

a "classic adjudicatory function." *Id.* at 203. The Court emphasized the committee

members were not independent; they were prison employees tasked with making

credibility determinations between coworkers and inmates. *Id.* at 203-04. They were

"under obvious pressure to resolve a disciplinary dispute in favor of the institution and

their fellow employee." *Id.* at 204. Moreover, the hearings lacked several procedural

safeguards: prisoners could not compel or cross-examine witnesses, conduct discovery, or

challenge hearsay evidence. *Id.* at 206. Also, there was no cognizable burden of proof,

and prisoners were not afforded a verbatim transcript. *Id.* "In sum, the [committee]

members had no identification with the judicial process of the kind and depth that has occasioned absolute immunity." *Id.*

Committee members argued the proceedings contained ample safeguards: inmates had prior notice, representation by staff members, the right to be present and offer evidence, a "detailed record," and the availability of administrative and judicial review. *Id.* They further argued committee members were usually persons of modest means who would be deterred from service without absolute immunity. *Id.* at 203.

The Court was unconvinced and determined that qualified immunity provided sufficient protection. *Id.* at 206. Although "less-than-absolute protection is not of small consequence," the Court observed, "[a]ll the committee members need to do is to follow the clear and simple constitutional requirements . . . they then should have no reason to fear substantial harassment and liability." *Id.* at 206-07 (citation omitted). "'[I]t is not unfair to hold liable the official who knows or should know he is acting outside the law, and . . . insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment.'" *Id.* at 207 (alterations in original) (quoting *Butz*, 438 U.S. at 506-07).

*Application of* Cleavinger *principles*

The procedural deficiencies here are at least comparable, and likely greater, than those in *Cleavinger*. In *Cleavinger*, the committee members were asked to resolve disputes between their coworkers and noncoworkers of less prominence accused of misconduct. Here, the Appeal Committee members were asked to resolve a dispute between an influential coworker and someone of less prominence accused of misconduct. We are unaware of any court that has extended quasi-judicial immunity in a similar situation.

Webb was afforded safeguards that the *Cleavinger* Court deemed insufficient. In both cases, the person accused of misconduct received prior notice of the charges, although the notice Webb received was somewhat vague. Both had an opportunity to present evidence, although it is unclear whether Webb was entitled to call witnesses.

But Webb was denied safeguards that were available even in *Cleavinger*. Webb's hearing was not recorded, and he was not permitted to hear and respond to adverse witnesses. Also, Webb was not provided a written decision explaining the Committee's findings and how those findings led to its conclusion, nor was he permitted to appeal the decision.

21

We recognize that knowledgeable individuals may be discouraged from serving important governmental functions if they are subject to civil liability. *See Buckles v. King County*, 191 F.3d 1127, 1136 (9th Cir. 1999). Indeed, nonjudicial actors often adjudicate contentious disputes and withholding absolute immunity permits a losing party to sue for damages rather than seek appellate review. *Id.* While this argument supports absolute immunity in some cases, we are unpersuaded by it here where so few safeguards existed to reduce the risk of an erroneous decision. *Cleavinger* denied absolute immunity to committee members whose neutrality could be questioned and whose procedures lacked many safeguards. We, thus, deny absolute immunity here to Committee members whose neutrality could be questioned and whose procedures lacked even more safeguards. Absolute immunity from civil damages under § 1983 is not an expansive doctrine; it is "[of a] rare and exceptional character." *Cleavinger*, 474 U.S. at 202; *see also Burns v. Reed*, 500 U.S. 478, 495, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991). As the *Cleavinger* Court observed, qualified immunity provides sufficient protection for decision makers who follow clear and simple constitutional requirements. 474 U.S. at 206-07.

We conclude that quasi-judicial immunity should not be extended here and reverse that portion of the trial court's order.

b. *Qualified Immunity*

The Appeal Committee argues the trial court erred when it determined the Committee was not entitled to qualified immunity. We disagree.

Qualified immunity generally shields government officials performing discretionary functions from suit so long as their conduct does not violate clearly established statutory or constitutional rights of which reasonable persons would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). It is intended to protect government officials "from undue interference with their duties and from potentially disabling threats of liability." *Id.* at 806.

When a defendant moves for summary judgment on a § 1983 claim and raises qualified immunity, the court has two questions before it. The first question is whether the facts asserted by the plaintiff make out a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). We have already answered this question in Webb's favor.

The second question is whether the right was clearly established at the time of the violation. *Id.*; *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). This requires the plaintiff to demonstrate that "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official

would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).  As mentioned previously, we established the contours of this federal right nearly 30 years ago in *Conard v. University of Washington*, 62 Wn. App. 664.  There, we explained what processes a public school must afford when reviewing a challenged cancelation of substantial financial aid.

Here, the processes the Appeal Committee afforded Webb fell far short of the processes described in *Conard*.  First, Webb was not permitted to hear and rebut evidence against him.  Second, there was no record made of the hearing for review purposes or even a right of appeal.  Third, the Appeal Committee did not provide Webb a written decision that set forth its determination of contested facts and the basis for its decision.  For these reasons, we conclude the Appeal Committee is not entitled to qualified immunity.

Reversed in part.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder, having no precedential value, shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BREACH OF CONTRACT

Webb contends the trial court erred by dismissing his breach of contract claim. He claims WSU's Handbook was incorporated by reference into his financial aid agreement, and WSU breached it by not following the discipline processes therein.

To establish a claim for breach of contract, a plaintiff must show a valid agreement existed between the parties that imposed a duty, the duty was breached, and the breach proximately caused damage. *Univ. of Wash. v. Gov't Emps. Ins. Co.*, 200 Wn. App. 455, 467, 404 P.3d 559 (2017); *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995). In interpreting a contract, courts give it "a practical and reasonable interpretation that fulfills the object and purpose of the contract rather than a strained or forced construction that leads to an absurd conclusion, or that renders the contract nonsensical or ineffective." *Wash. Pub. Util. Dists.' Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam County*, 112 Wn.2d 1, 11, 771 P.2d 701 (1989).

Incorporation by reference allows contracting parties to incorporate contractual terms by reference to a separate agreement. *W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 102 Wn. App. 488, 494, 7 P.3d 861 (2000). Courts will not incorporate terms by reference unless it is clear that the contracting parties intended to do so. *See id.* at 494-95.

The financial aid agreement required WSU to provide Webb with a full athletic scholarship from the spring of 2017 through the 2020-21 academic year. The agreement permitted WSU to cancel Webb's financial aid for various reasons, including if Webb violated a "documented institutional rule or policy." CP at 321. This reference to "documented institutional rule or policy" does not indicate the parties' clear intent to incorporate the Handbook's discipline processes into Webb's financial aid agreement. Nor did it create a promise or a duty for WSU to abide by the Handbook. Rather, the reference provided examples for the types of rules or policies, the violation of which could result in cancelation of financial aid.

We conclude the financial aid agreement did not incorporate by reference the Handbook's discipline processes.[9]

---

[9] Webb also relies on employment law cases to establish an implied contract claim. This legal theory was not raised below, so we will not consider it on appeal. RAP 2.5(a).

26

INTENTIONAL INTERFERENCE WITH THE AGREEMENT

Webb contends the trial court erred by dismissing his tortious interference with contract claim against Coach Leach.

In order to establish a claim for tortious interference of contract, a plaintiff must show: (1) the existence of a valid contract, (2) defendant's knowledge of that contract, (3) defendant intentionally interfered to breach or disrupt the contractual relationship, (4) defendant interfered for an improper purpose or used improper means, and (5) resulting damage. *Deep Water Brewing, LLC v. Fairway Res. Ltd.*, 152 Wn. App. 229, 261-62, 215 P.3d 990 (2009).

The interferer must be an intermeddling third party; "a party to a contract cannot be held liable in tort for interference with that contract." *Houser v. City of Redmond*, 91 Wn.2d 36, 39, 586 P.2d 482 (1978). An employee is a third party to a contract only if the employee acts outside the scope of employment. *Id.* at 40. An employee who fails to act in good faith acts outside the scope of employment. *Conard*, 62 Wn. App. at 675.

---

Webb's reply brief raises an argument he failed to raise in his opening brief. He argues WSU was required to follow the procedures in the Handbook even if it was not incorporated by reference into the financial aid agreement. We do not consider issues raised for the first time in a reply brief. *In re Marriage of Bernard*, 165 Wn.2d 895, 908, 204 P.3d 907 (2009).

27

"[G]ood faith means 'nothing more than an intent to benefit the corporation.'" *Id.* (quoting *Olympic Fish Prods., Inc. v. Lloyd*, 93 Wn.2d 596, 599, 611 P.2d 737 (1980)).

Webb argues there is a genuine issue of material fact as to whether Coach Leach acted outside the scope of employment. He argues Coach Leach lied by claiming that a violation of his team rules results in dismissal from the team and this lie is evidence of bad faith. But the question is not whether Coach Leach lied; the question is whether Coach Leach intended to benefit WSU by enforcing his team rules. When a player violates a team rule, especially by engaging in criminal conduct, the reputation of the football team and WSU suffers. Enforcing team rules is necessary to encourage players not to violate them. A reasonable trier of fact could only conclude that Coach Leach, by enforcing team rules, intended to benefit WSU. That Coach Leach, at times, failed to enforce team rules does not mean enforcing team rules is outside Coach Leach's scope of employment.

We conclude the trial court did not err by dismissing Webb's tortious interference with contract claim against Coach Leach.

NEGLIGENCE

Webb contends the trial court erred by dismissing his negligence claim. He argues the respondents owed him a duty to follow correct procedures, whether those within the Handbook or those required by due process.

A claim of negligence requires a plaintiff to show (1) the existence of a duty owed, (2) breach of that duty, (3) injury, and (4) a proximate cause between the breach of the duty and the injury. *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994). The first element—whether the defendant owed a duty to the plaintiff—is a question of law. *Id.* at 128. If a duty is established, issues of fact regarding breach of that duty, proximate cause, and the plaintiff's injuries are typically left to the trier of fact. *Johnson v. State*, 77 Wn. App. 934, 937, 894 P.2d 1366 (1995); *Fuentes v. Port of Seattle*, 119 Wn. App. 864, 868, 82 P.3d 1175 (2003).

Respondents argue the independent duty doctrine bars negligence claims based on contract and cite *Eastwood v. Horse Harbor Foundation, Inc.*, 170 Wn.2d 380, 394, 241 P.3d 1256 (2010). Webb replies by narrowing his argument to procedural due process and argues his right to procedural due process arises independently of any contract.

Governmental entities are liable for damages arising out of their tortious conduct, or the tortious conduct of their employees, to the same extent as private persons or

corporations. *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 878, 288

P.3d 328 (2012) (citing RCW 4.96.010(1)). When a governmental entity is the defendant

in a negligence action, "the public duty doctrine provides that a plaintiff must show the

duty breached was owed to him or her in particular, and was not the breach of an

obligation owed to the public in general . . . ." *Id.*

Webb argues he and the respondents had a special relationship, sufficient to

establish the existence of a duty. We disagree. Only an express assurance by a

government official can be the basis for finding an actionable duty under the special

relationship exception to the public duty doctrine. *See Cummins v. Lewis County*, 156

Wn.2d 844, 855, 133 P.3d 458 (2006). An assurance that is merely implied or inherent in

the nature of the governmental activity will not suffice. *Id.* at 856.

Here, neither WSU, Coach Leach, nor the Appeal Committee gave Webb an

express assurance that he would receive procedural due process. At best, any assurance

was implied or inherent in the nature of the appeals process. This is insufficient.

We conclude the trial court did not err by dismissing Webb's negligence claim

against the respondents.

No. 37051-8-III
*Webb v. WSU*

Reversed in part.

_____
Lawrence-Berrey, J.

I CONCUR:

_____
Pennell, C.J.

No. 37051-8-III

FEARING, J. (concurring) — I agree with the majority's affirmation of the dismissal of Zaire Webb's cause of action for negligence. Nevertheless, I would dismiss on the basis of a lack of tort duty, rather than on the public duty doctrine. A special relationship between Webb and Washington State University may have resulted from the termination of Webb's financial aid and his appeal of the termination of the aid.

Zaire Webb contends that Washington State University negligently conducted the appeal hearing by failing to comply with due process requirements. During oral argument, Webb conceded that no case stands for the proposition that an entity, let alone a government entity, holds a duty in tort to conduct a review or appeal hearing in a competent fashion. Contentions unsupported by argument or citation of authority will not be considered on appeal. RAP 10.3(a)(5); *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 36, 723 P.2d 1195 (1986). The failure to follow due process should be analyzed solely under the rubric of due process and not also under negligence.

I CONCUR

_____
Fearing, J.